## SILAS COOK *vs.* THE BOARD OF CHOSEN FREEHOLDERS OF MIDDLESEX.

1. Under the constitution and laws of this state, the granting of a general pardon to a party convicted, or a partial pardon, by remitting his fine or the costs of prosecution, will not entitle the party to a restitution of the fine or costs, or to indemnity for any part of the penalty which he may have paid or suffered. The pardon operates prospectively only, by terminating the penalty, and giving to the party pardoned a new credit and capacity.

2. If a party is entitled to recover back a fine which has been paid over to the county authorities, whether he should bring a suit against the county, or apply to the state for restitution. *Query.*

An action of debt was brought in this court by Silas Cook against the board of chosen freeholders of the county of Middlesex. The ground of action and the facts in the case appear in the opinions delivered.

The parties agreed upon a state of the case setting forth the facts, and that the question whether, upon the facts stated, the plaintiff was entitled to recover, should be submitted to the court, and that judgment should be entered according to the decision, with costs to the successful party. And it was further agreed that either party should be at liberty to turn the state of the case into a special verdict, and have the opinion of this court reviewed in the Court of Errors.

The cause was argued at November Term, 1856, before the CHIEF JUSTICE and Justices OGDEN, RYERSON, and VREDENBURGH.

*W. Pennington,* for the plaintiff.

*G. A. Vroom* and *C. Parker,* for the defendants.

The CHIEF JUSTICE. This action is brought to recover the sum of one thousand dollars, the amount of a fine

inflicted on the plaintiff upon his conviction of a crime. The fine was paid by the plaintiff to the sheriff, and in May, 1853, the money was paid by the sheriff to the county collector of Middlesex, pursuant to the requirements of the statute. In June, 1855, the Court of Pardons granted to the said Silas Cook, in the language of the certificate, " a full and free pardon for the crime of which he was convicted, also that the fine of one thousand dollars, imposed upon the said Silas Cook by the said court for the offence aforesaid, be remitted."

The first and leading question presented in the case is, whether the remission of a fine by the pardoning power, under the constitution of this state, entitles the party pardoned to " restitution," the fine having been paid prior to the pardon. In considering this question, it will be proper to consider the money as remaining in the treasury of the state. The fact that it was paid into the county treasury pursuant to law, and that it is now held by the county under legal sanction, will be laid out of view.

By the constitution of this state, Art. V., § 9, it is provided that the governor, or person administering the government, shall have power to suspend the collection of fines and forfeitures, and to grant reprieves, to extend until the expiration of a time not exceeding ninety days after conviction. And by Art. V., § 10, it is declared, that the governor, or person administering the government, the Chancellor, and the six judges of the Court of Errors and Appeals, or a major part of them, of whom the governor, or person administering the government, shall be one, may remit fines and forfeitures, and grant pardons *after conviction,* in all cases except impeachment. The pardon granted to the plaintiff is in the terms of the constitution. The crime is pardoned, and the fine is remitted. Does the remission of the fine, in the language of the constitution, import restitution, repayment, or restoration of the fine, after it has been paid? The inquiry is not what the

Court of Pardons intended, for they are presumed to have intended precisely what the constitution authorized. It is, therefore, a pure question of constitutional construction, what is the import of the power conferred by the constitution to remit fines and forfeitures.

There is no doubt that the word *remit* is sometimes used in the sense of return or restoration, though in this sense Dr. Johnson says that the word is obsolete. Thus a man is said to be remitted to his rights or to his liberty. So in case of " remitter" it is said, by Blackstone, that the party is remitted, or sent back by operation of law to his ancient and more certain title. 3 *Black. Com.* 20. But as applied to the penalty of crime, the word has a totally different signification. It is used as equivalent to pardon or a discharge from the penalty of transgression. " To remit" is defined by our best lexicographers to be to forgive, to pardon, to release from punishment or penalty. It is so uniformly used in that rich mine of pure Anglo-Saxon, the English translation of the New Testament, numerous instances of which will occur to every familiar reader of that volume. Thus, in *John* XX.: 23, " whomsoever sins ye remit they are remitted." It is used by legal writers to import discharge from the penalty of transgression. In this sense, Blackstone uses it when he says the punishment of the offender may be remitted and discharged by the concurrence of all parties interested. 4 *Black. Com.* 316. Pardon, in law, is the remitting or forgiving of an offence committed against the king. *Jacob's Law Dict.*, " *Pardon.*" A full and free pardon, in itself, necessarily involves a remission of the penalty of the crime. *Hawk.*, *b.* 2, *ch.* 37, § 48. It is absurd to think of a man's being pardoned, and yet left to pay the fine, to suffer imprisonment, or to endure any of the penalties of his transgression, subsequent to his pardon. In the *People* v. *Pease,* 3 *Johns. Cas.* 333, it was held, by the Court of Errors of New York, that a proviso in a pardon, that it was not to be construed to relieve the party pardoned from the legal

disabilities arising from his conviction and sentence, was incongruous and repugnant to the pardon itself. The effect of a pardon is to acquit the offender of all the penalties annexed to the conviction. *Deming's case*, 10 *Johns. R.* 232. What the party convicted has already endured or paid, the pardon does not restore, but it releases him from all further penalty. And hence a pardon before conviction, under the English law, prevented any of the penalties of the conviction from attaching. *Hawk.*, *b.* 2, *ch.* 37, § 53.

The effect of a pardon subsequent to the conviction is to make the offender a new man, and to acquit him of *all penalties and forfeitures* annexed to the offence for which he obtains his pardon. *Jac. Law Dict.*, "*Pardon*" 4.

The power of granting pardons includes the power of remitting any part of the penalty. A part of the sentence may be remitted without pardon, but the criminal cannot be pardoned without remitting the penalty. The constitution of the United States vests in the president the power of pardoning, without any specific grant of power to remit fines and forfeitures. Yet the power of remitting fines and forfeitures is constantly exercised by the president without question. So the ancient constitution of this state simply conferred the power of pardoning, but it was always construed to include the power of discharging from fine and imprisonment.

This subject is well considered in *Perkins* v. *Stevens*, 24 *Pick.* 277. By the Massachusetts constitution of 1780, the power of pardoning offences was vested in the governor, by and with the advice of council. Under that general power a charter of pardon was granted, whereby the governor, with the advice of the council, remitted to the convict " the residue of the punishment he was sentenced to endure." The general power, (of pardoning offences,) say the court, necessarily includes in it the lesser power of remission and commutation. If the whole offence may

be pardoned, *a fortiori* a part of the punishment may be remitted, or the sentence commuted.

The clause in the present constitution authorizing the pardoning power to remit fines and forfeitures, as well as to grant pardons, does not by implication diminish or qualify the effect of a general pardon. Its design was, by express terms, to confer the power of remitting a part or the whole of the penalties consequent on conviction, of granting a partial or a full pardon, and also the power of remitting fines or forfeitures inflicted when there is no conviction of a crime, and consequently can be no pardon. The case, therefore, is not in reality altered by the fact that the pardon granted to the plaintiff contains in express terms a remission of the fine. That is necessarily implied in the general pardon, as much as would be a discharge from imprisonment or a removal of the civil disabilities consequent upon conviction. The question then is, whether a general pardon, granted after a sentence has been fully executed and the fine paid, entitles the party to a restitution or re-payment of the fine. At first view it seems eminently just that if the party is discharged from the payment of the fine by its remission before payment, the fine should be restored, if remitted after payment. But it must be borne in mind that the pardon or remitting of the penalty has no retrospective operation. It takes effect, and puts a period to all further infliction of punishment from the time it is granted. It has no operation upon that part of the sentence already inflicted. Had the defendant been sentenced to imprisonment, instead of being fined ; or, being fined, had he been unable to pay his fine, and consequently been imprisoned, in either event he must have endured the infliction until the pardon was granted, or until his sentence had expired. The fine inflicted upon the plaintiff was, in reality, a much less punishment than a year's imprisonment would have been. Yet that punishment, or more, might have been borne, had he been unable to pay his fine. Upon what ground of justice can he claim to have the money re-

stored to him after pardon, which could not be urged with equal force as a reason for indemnifying a party who had suffered imprisonment as the punishment of his crime? I know of none; and this consideration, I think, is not without its weight. To establish the principle that a pardon entitles the party to a restitution of the fine, would draw a most oppressive distinction between poor and rich criminals. Fines are usually inflicted upon those having the means to pay them, or if inflicted upon the poor, it results in imprisonment for want of ability to discharge the fine. Those, alone, who have the ability to pay escape imprisonment; and if a pardon is to entitle them to a restitution of the fine, the inevitable result is, that they escape punishment by means of their riches, while the poor are left to suffer in consequence of their poverty.

If pardons were granted upon the idea of the innocence of the party pardoned, there would be manifest justice in returning the fine not only, but also in making full indemnity for all the injury sustained by reason of the conviction. And a recent decision is based upon the ground that a pardon proceeds upon the idea of innocence. The power, it is said, is given to the executive to relieve against the possible contingency of a wrongful conviction. I am not aware that this idea of *innocence* has ever been assumed by any writer upon government, or law, or ethics, as the true foundation of the pardoning power in the state. No doubt a clear case of innocence presents the strongest ground for the immediate remission of all the penalties of conviction. But that is not, in practice, the ground upon which pardons are or ought to be based, nor is it the ground upon which the pardoning power in a government is created and sustained. Pardon implies guilt. If there be no guilt there is no ground for forgiveness. It is an appeal to executive clemency. It is asked as a matter of favor to the guilty. It is granted not of *right* but of *grace*. A party is acquitted on the ground of innocence; he is pardoned through favor. And upon this very ground it is that the pardoning power is never vested in a judge.

The effect, as Montesquieu remarks, would be to confound all ideas of right, and render it impossible to tell whether a man was acquitted on the ground of innocence, or pardoned, though guilty, on the ground of mercy. *Montesquieu's Sp. of Laws, b. 6, ch. 5.* It is not always necessary to punish crimes in themselves punishable, for there are cases in which the sovereign may pardon. The public good is the ultimate end of all punishment. If, therefore, there are circumstances in which by pardoning as much or more advantage is procured than by punishing, then there is no obligation to punish, and the sovereign even ought to show clemency. In a word, the public advantage, which is the true measure of punishment, sometimes requires that the sovereign should pardon because of the great number of criminals." 2 *Burlamaqui's Princ. of Nat. Law* 137, *part 3, ch. 4.*

"The prerogative of pardon is properly reserved to the chief magistrate. The power of suspending the laws is a privilege of too high a nature to be committed to many hands, or to those of any inferior officer in the state. But let this power be deposited where it will, the exercise of it ought to be regarded not as a favor to be yielded to solicitation, granted to friendship, or, least of all, to be made subservient to the conciliating or gratifying of political attachments, but as a judicial act, as a deliberation to be conducted with the same character of impartiality, with the same exact and diligent attention to the proper merits and circumstances of the case, as that which the judge upon the bench was expected to maintain and show in the trial of the prisoner's guilt. The questions, whether the prisoner be guilty, and whether, being guilty, he ought to be punished, are equally questions of public justice. The adjudication of the latter question is as much a function of magistracy as the trial of the former. The public welfare is interested in both. The conviction of an offender should depend upon nothing but the proof of his guilt, nor the execution of the sentence upon anything beside the quality and circumstances of his crime." *Paley's*

*Mor. and Polit. Philosophy* 429. The same principle will be found in *Montesquieu's Spirit of Laws, b.* 6, *ch.* 21; *Beccaria on Crimes* 136, *ch.* 43; 4 *Bla. Com.* 397.

The principle universally propounded is, that pardon is an exercise of sovereign or executive clemency toward the guilty. It is a suspension of the just sentence of the law, induced by the facts and circumstances of the crime or by the character and condition of the criminal. The power of pardoning is founded on considerations of the public good, and is to be exercised on the ground that the public welfare, which is the legitimate object of all punishment, will be as well promoted by a suspension as by an execution of the sentence. If the party convicted be innocent, nothing short of an utter abrogation of the sentence, restitution of all that he has paid, and compensation for all that he has suffered, can fill the measure of justice. Nothing of this sort is contemplated or effected by a pardon.

If, upon the idea of innocence, the party convicted is to be restored to the fine, why not to the costs also ? I am aware that the rule is laid down in many authorities that a pardon will not discharge a party from the payment of costs. *Bac. Ab., " Pardon " B ; Ex parte McDonald,* 2 *Wharton* 440; *Holliday* v. *The People,* 5 *Gilman* 214. The rule is founded on the principle that by the conviction, the officers to whom the costs are payable, acquire a vested right in them (in like manner as an informer acquires a vested right in the penalty given him by law), which cannot be divested by the operation of the pardon.

But in *Holliday* v. *The People,* 5 *Gilman* 214, it is said by the court, that if the people paid costs in criminal cases it might be that a general pardon would release the costs of prosecution, and in this state the power of remitting the costs has been very frequently exercised by the Court of Pardons. Very many pardons have connected with them an express remission of the costs, in like manner as in this case there is a remission of the fine. And

the power of remitting the costs is now by statute con-
ferred upon the inspectors of the state prison. *Nixon's
Dig.* 769, § 6. The practice, as well as the statute, is no
doubt founded on the statute which requires that the
costs of conviction of every offender sentenced to hard
labor and imprisonment shall be paid by the treasurer of
the state. *Nixon's Dig.* 768, § 3. So far, then, as the officers
are concerned, the state assumes the responsibility and
pays the costs, whether the prisoner is pardoned or not,
and the pardon or the remitting of the costs in nowise
interferes with the vested rights of the officers. It is a
question entirely between the state and the convict; and
if the party upon a remitting of the fine is entitled to
have it restored, it is difficult to see upon what principle
the state could refuse to restore the costs also, upon the
granting of a general pardon or upon a remitting of the
costs. But the power of remitting the costs has never
been understood to confer the power of restitution or re-
payment. And, in like manner, the power of pardon and
remitting the fine was never designed to confer, and does
not confer, the power of repaying the fine after it has been
collected. The remitting of the fine, as has already been
said, was necessarily included under a general pardon, and
the fact that no claim for the repayment of fine or of costs
which have been remitted has hitherto been made, is a clear
indication of the construction given to the constitution and
the law.

I am of opinion that, under the constitution and laws
of this state, the granting of a general pardon to a party
convicted, or a partial pardon by the remitting of his fine
or the costs of prosecution, will not entitle the party to a
restitution of the fine or costs, or to indemnity for any
part of the penalty which he may have paid or suffered;
that the pardon operates prospectively only, by terminating
the penalty, and giving to the party pardoned a new credit
and capacity.

There is a single case in this country which maintains

a contrary doctrine. I refer to the case of *Flournoy, Attorney General*, 1 *Kelly's Rep.* 606. The case was not cited upon the argument, and it is now referred to in justice as well to the counsel as to the court, that it may not be supposed that the authority has been overlooked, or the careful consideration of the authorities in support of the plaintiff's case omitted. That case undoubtedly supports the plaintiff's claim in its fullest extent. It holds that an executive order for remitting a fine entitles the party to a restitution of it, and that, even if paid over to the county, the county would be compelled to return it to the defendant. With all respect for that learned tribunal, I am constrained, for reasons already stated, to dissent entirely from the conclusion of the court, and from the reasons upon which it is founded. It proceeds entirely upon the theory that the pardon is granted upon the idea of the party's innocence ; a theory which is as mischievous in its tendency as it is at war with the fundamental principles of government and the actual exercise of the pardoning power in this state. Of one hundred and forty one convicts discharged from the state prison during the past year, fifty-three, more than one-third of the whole number, as appears by the inspector's official report, were pardoned. A large portion of this number were pardoned on the eve of the expiration of the sentence, with the view, it is supposed, of removing the civil disabilities consequent upon conviction. Is it to be assumed that the parties thus pardoned are innocent ? If it be, it is difficult to determine whether the maladministration of criminal law or the tardy exercise of the pardoning power be the greater evil.

The case of Flournoy, so far as my researches have gone, stands alone, entirely unsupported by authority. None of the cases cited and commented on by the court support the doctrine of that case. 4 *Wash. C. C. R.* 64 ; 10 *Wheaton* 246 ; 2 *Bay.* 565 ; 1 *Nott & McC.* 26. These cases, with many others which might be cited, establish

these positions (the soundness of which is not questioned), viz., that the remission of a fine by the pardoning power operates to arrest, the collection of the fine, and to discharge the party from its payment, so far as regards that portion of the fine which belongs to the public; but so far as regards that portion of the fine which is vested by law in third persons, the remission of the fine is inoperative to affect vested rights. But they give no countenance to the theory that when the fine is paid, the party is entitled to restitution. On the contrary, in *The State* v. *Williams*, 1 *Nott & McC.* 26, the court held that the money in the hands of the commissioners of roads as much belonged to the state as if it had been directed to be paid into the state treasury, and that the commissioners had no right which might not be defeated by the intervention of the governor between the imposition and *the collection of the fine.* The court thus carefully excluding the idea that the fine, when collected and paid, either into the treasury of the state or into the hands of the commissioners of roads, could be recovered by the party upon the fine being remitted by the executive.

This conclusion renders it unnecessary to consider another question, suggested upon the argument, viz., whether, admitting the plaintiff to be entitled to a restitution of the fine, his action is properly brought against the county. In 1 *Nott & McC.* 26, and in 1 *Kelly* 611, it was held that the money in the hands of the commissioners of roads or in the hands of the inferior court for county purposes, still belonged to the state as much as if it were in the state treasury. If this be the true view of the question, it would seem that the claim of the plaintiff is against the state, and not against the county. On the other hand, if the money has been paid over by the state to a third party, and has actually, as well as in legal contemplation, passed from the treasury of the state into the treasury of the county, upon what principle is the fund to be followed into the hands of the third party?

What privity is there between the plaintiff and the defendant to constitute an indebtedness in law? The money was paid to the county under the sanction of law. The judgment under which it was collected has not been reversed, but stands in full force against the plaintiff. The law which authorized the payment to the county has not been repealed. The title of the county to the money was once legal and valid. When was that title divested? But admitting the right of the state to recall the money from the county treasury, has the plaintiff any such right?

These are certainly grave questions; but they were not fully discussed upon the argument, and it is unnecessary to decide them now.

VREDENBURGH, J. The plaintiff was convicted in the Oyer of a rape, and fined a thousand dollars. He paid the fine immediately to the sheriff, who paid it to the county collector, and it was thereupon carried to the credit of the county. Afterward the Court of Pardons remitted the fine, and pardoned the plaintiff.

The object of the suit is to recover back this fine. The act (*Nix. Dig.* 277, § 30,) provides that all fines received by the sheriff on conviction upon any indictment shall be paid by him to the county collector, and carried by him to the credit of the county.

Before this pardon was granted, this money had passed beyond all power which the Oyer possessed, either over the fine or over its own officers. Its action, as to that indictment, had run its course; it was, as to that, *functus officio*. This is not a question, therefore, of the power of the Oyer over its own officers or over funds still within its own control. Nor is it a question of the power of the Court of Pardons to arrest the proceedings of the criminal court before they have attained their final consummation. But the question is—*first*, whether the Court of Pardons possess the abstract constitutional power of restitution; and *second*, whether, if they do, that power can

be enforced against the present defendants in an action of debt.

*First.* Does the Court of Pardons possess the power of restitution ?

If they do, it is not as a judicial or a legislative, but only as an executive power. The pardoning power of this court is expressly classed by the constitution in the executive department. And Art. 3, § 1, declares that no person or persons belonging to or constituting that department shall exercise any of the powers properly belonging to either of the others. Does the Court of Pardons, then, as an executive function, possess this power of restitution ? If it does in the case before us, where the fine was paid some two years before the pardon, it is not easy to perceive, as no statute of limitations runs against them, why they do not possess it in all other cases; or why, from the similarity between our own constitution and those of the other states, a similar power does not also exist there, and why every fine or forfeiture which has ever been collected from the foundation of the government, not only in our own, but also in all the other states, are not liable to be at any time divested and restored to their former owners by the simple mandate of an executive pardon. The question therefore assumes very large proportions, and should, if considered as involved in any doubt, receive serious consideration.

The only power possessed by the Court of Pardons is that conferred on it by section 10 of article 5 of the constitution of 1846. This provides that " the governor, chancellor, and the six judges of the Court of Appeals, or a majority of them, of whom the governor shall be one, may remit fines and forfeitures and grant pardons after conviction."

The plaintiff is obliged to contend that these terms, remit fines and forfeitures and grant pardons, include the idea to restore a fine at any time after payment, and confer the power upon our executive to follow a fine at any

time after payment into the state treasury, or wherever else it may be, and not by any act in its nature legislative or judicial, but by a simple executive mandate, compel any citizen or the corporate sovereignty of the state to restore it to its former owner.

I think no such power was ever intended to be conferred, first, because the terms, remit fines and grant pardons, were never used in such a sense in relation to the pardoning power.

Certain pardoning powers, very similar to or indentical without our own, have been vested, by their respective constitutions, in the federal and in all the state executives. In the constitution of the United States, the language is, " the president shall have power to grant pardons." In some of the states, the language is, " the governor shall have power to grant pardons," in others, " to grant pardons and remit fines," in others, " to grant pardons after conviction," in others, " to remit fines and to grant pardons after conviction." In no less than fourteen of them, it is " to remit fines and to grant pardons." These constitutions have been in force, more or less of them, from the Revolution to the present time. Immense numbers and amounts of fines have during that period been paid into the state treasuries, which have been used by the states, or paid out by them to the counties or others their grantees. If such a power had been considered to exist, it is impossible to conceive that through such a long period of time, in so many states, numerous occasions should not have arisen to call it into exercise, and many questions in relation to it have been agitated in our courts.

Yet I have never seen the report of a case, nor have I ever heard of an instance, where a fine has been repaid under the exercise of this power of the executive, after it has once passed beyond the power of the court by which it was imposed. So far as I am aware, this power has only been used to prevent, and not to restore the payment of a fine. The absence of the exercise of this power of

restoration, as a part of the pardoning power from the Revolution to the present time, is very strong evidence of the sense in which these terms were used in those instruments. Some cases are reported upon the subject. But where they do not deny the power, they will be found to turn upon the question of the power of the courts over their own officers, or upon whether the fine had or had not passed beyond the control of the court by which the fine was imposed, or whether the fine had or had not been in fact paid to the state or party interested before the interference by the court, and not upon whether the state executives were supreme with respect to restoring a fine, as well as to staying its collection.

But we have other sources from which to borrow light upon the sense in which these terms were used. Our federal and state constitutions have been adopted at and since the Revolution, and their framers evidently used the British as their model, making such changes as the physical condition and feelings of our people demanded. The one has its king, lords, and commons, the other its president or governor, senate and assembly. But we still retained in ours the same general division of powers, the executive, legislative, and judicial, and clothed the grants in the technical language of English law.

The power of pardoning, as lodged in our federal and state executives, holds the same position in our framework of government as the royal prerogative of pardon does in the English, but limited and diluted by a jealousy of that prerogative. Our Court of Pardons represents not the parliament, but the king and his privy council.

Now these terms, to remit a fine and to grant a pardon, had, at and before their adoption by us, been immemorially used by the British crown in royal charters of pardon, or instruments in the nature thereof. These had often come before their courts for construction or enforcement, and had received at their hands a definite and technical meaning. It is to be presumed that the framers of our consti-

tutions, when they incorporated in them the terms remit and pardon, used them in the same sense they had always been used in before, and thereby intended to give to our executives the same power which the crown exercised when it remitted a fine or forfeiture or granted a pardon.

The term *pardonavit*, in a charter of pardon, related to the crime. It pardoned the crime, and, as a consequence, discharged the punishment. It made a new man of the party convicted. He could be a witness again; he could prosecute for slander for being called a criminal. Majesty forgave the crime; it would not punish what it forgave. *Culpa et pœna* were both gone in *foro humano*, and if the charter came before conviction the whole thing was ended.

But this term pardon was never construed in the English courts to release any vested right in property. It had no operation upon a fine or forfeiture after conviction, for they were then considered to be vested.

To meet such cases, it was customary for the crown to issue its letters patent to remit the fine, the operative words of which were, remit, release, and quit-claim, and which also contained instructions to the attorney-general to enter a satisfaction of the fine on record. These issued where the whole punishment was a fine enforced by imprisonment. The term remit operated upon and discharged the imprisonment; the word release discharged the king's right to the fine itself. Except so far as vested property was concerned, the word pardon produced the same results without the words remit and release as with them. To remit a fine after conviction was not strictly the exercise of the pardoning power; it operated only on the punishment. The unforgiven crime remained.

A party convicted of an infamous crime, and only punished by fine or by fine and imprisonment, was not restored to his civil rights by a mere remission. The term pardon was necessary to effect that object. The power to

remit a fine resulted to the crown as a necessary consequence of the fine belonging to and coming to himself.

Our constitution of 1776 only gave to the executive the power to grant pardons after condemnation. When our convention of 1844 came to review the ground more carefully, they gave the additional power to remit fines and forfeitures, thereby recognizing the distinction we have made, and showing that they meant to confer on our executive not only the power the crown exercised when it used the term pardon, but that, also, which it exercised when it issued its letters patent of remission. The difference in the language conferring the pardoning power in the federal and in the different state constitutions may have arisen from this distinction not being distinctly kept in view.

So, also, with respect to a forfeiture. This was also, in English criminal law, vested by conviction or attaint; but it, again, was then a different thing from a fine. The latter, until actual payment, was a vested right in action, and therefore passed by the term release. But a forfeiture, after conviction and seizure by the officers of the law, was considered a thing vested in possession, and would consequently not pass, either by pardoning the crime, remitting the punishment, or releasing the right. When a charter of pardon containing only these words was interposed, the courts then replied, these goods are things vested in possession of the king; you must show us the king meant to restore these goods to you before we will command the officers to re-deliver them. When it was the intention of the crown that the goods should be returned, he caused the word *restituit* to be inserted in the instrument. Thus if a man was convicted of an infamous crime which operated a forfeiture, and he was also sentenced to fine and to imprisonment, and it was intended to free him from infamy and restore him to citizenship and free him from the sentence of imprisonment, the term *pardonavit* was used; if it was also intended to pre-

Cook v. Freeholders of Middlesex.

vent the fine from being enforced by imprisonment, the term remit the fine was used; if to give up the right to the fine itself, that was effected by the term release; if to return the forfeited goods, the word restore was also inserted. Thus the crown pardoned the crime, remitted the punishment, released the right in action, restored the thing in possession.

But none of these charters, with any of these words, or all of them put together in them, were ever used, or intended or construed to have the power, through the action of the courts, to take the money, or the fine, or the proceeds of the forfeiture from the royal treasury, after it once had got there; on the contrary, their only effect and object was to prevent its getting there. As the fine and forfeiture belonged to the crown, and went into its coffers, such a thing would have been an absurdity. It would have been a royal mandate upon the courts to issue a writ of restitution upon the royal treasury. It would, it appears to me, have been a curious thing to see a counselor with a royal charter in his hand, *sub pede sigilli*, apply to the King's Bench, by virtue thereof, to send their writ and their officers into the king's exchequer.

After the fine or forfeiture got into the king's treasury, he could do with his own as he pleased, and, if he saw fit, could give it to the defendant, or to whomsoever he willed. But this was done, if done at all, by way of gift or grant, and not by any instrument in the nature of a pardon, and through the action of the courts. The object of these charters of pardon, with any or all these words in them, was not to ask the courts to enable the king to take the money out of his own treasury—he could do that without their assistance—but to stop the machinery of the courts in their endeavors to send it in.

It is not necessary to inquire, now, what powers were intended to be conveyed by the terms to grant pardons in the constitution of the United States, or of those states which only contain that word. It was, perhaps, intended

by their framers not to use that term in its precise technical sense, but to include in it the power to release a vested right to the fine, and to its enforcement as a punishment. But it is apparent that the framers of our constitution of 1844 intended to be more accurate, and used the terms pardon and remit in their precise technical meaning. In the constitution of 1776, the language used is, the governor, &c., shall have power to pardon criminals after condemnation. If this had been deemed to include releasing a fine or forfeiture after conviction, it is not to be presumed that the constitution of 1844 would have been altered in this respect.

In the constitution of 1844, the language is, the governor, &c., may remit fines and forfeitures, and grant pardons after conviction. If this had all meant the same thing, why would the constitution of 1844 have been burthened with such tautology? It is evident that the term pardon, in the constitution of 1844, is used in the technical sense it had for centuries before been used in the royal charters of pardon, and on that account did not discharge a right in a fine vested by conviction, and therefore it became necessary, to effect that object, to add the term remit the fine. And, by putting in this term, it is evident it was the intention to give, by the term remit, not the power the crown exercised when it granted a pardon, but the power it exercised when it issued letters-patent to remit a fine.

So when the convention of 1844 came to the subject of forfeitures. The forfeitures spoken of by the constitution of 1844 were very different things from the forfeitures spoken of in the royal charters. By the English criminal law, the forfeiture was the legal result of conviction and attainder. The goods and lands, the thing itself, was forfeited and seized by the officers of the law. But when our constitution of 1844 was adopted, all these things had in this country been long since changed. Crime had then here long ceased to work corruption of blood and forfeit-

ure of estate; and the only forfeitures that remained, and were in contemplation of the convention, were pecuniary forfeitures enforced by judgment and collected by execution. They were like fines until actual collection, not, like the British forfeitures, things in possession and the subject of restoration, but vested rights in action discharged by release. Therefore it was in our constitution of 1844 as technically correct to say, we remit the forfeiture, as to say we remit the fine. It is apparent upon the face of the constitution of 1844, and is the legal presumption, that the terms, remit fines and grant pardons, were there used in their then well-known technical meaning.

But the plaintiff urges that this is too narrow a meaning to give to the terms remit and pardon in our constitution; that it was the intention to vest in our executives the whole pardoning power of the crown, as it was understood to exist at the date of the revolution, and that that embraced the power to restore a fine as well after it was paid into the treasury as before. But, as we have seen, this was no part of the pardoning power, and it was absurd to call it so. But suppose it was, could it ever have been intended to vest this branch of the prerogative of pardon in the executives of these republics? If such had been the intent, would they not have used some word plainly apt to express such intent? And yet we find none such, not even the word restore, in any of these instruments.

But it appears to me, in the next place, that no such power was intended to be given, because it would be inconsistent with other parts of the constitution, and in hostility to its spirit.

At the date of our revolution, although large portions of the original despotic power of the crown had passed to the legislative and judicial departments of the government, yet many still remained, and were called the royal prerogatives, by virtue of which the king was the public prosecutor. All prosecutions were in his name; all crimes

were alleged to be against his peace and dignity. It was his majesty that was offended; it was his dignity that was insulted; it was his peace that was broken. The punishment was to atone for the offence against him; the fine of forfeiture belonged to, and went as of course into his treasury.

The power to pardon, to remit, and to restore resulted to him as a necessary consequence of this theory. Now, in framing our constitutions, and using the British as their general model, the feeling most apparent in our conventions, as it had been for centuries before with the people of the British islands, was jealousy of the executive. The great changes upon the model were in lessening this power, and transferring it to the other departments. They, in the first place, made the executive not hereditary, but elective. It no longer represented the majesty of the people. Public prosecutions were no longer conducted in its name, but in the name of the corporate sovereignty. No *crimen læsæ majestatis* could be committed against our executives; no crime alleged to break their peace or wound their dignity.

As a necessary consequence, the fine and forfeiture went not to our executives, but, by the instrument, to the party whose peace was broken, and whose "government and dignity" had been contemned and insulted, viz., the corporate sovereignty of the people. The crown might restore a fine after it had received it, because it went to and belonged to itself; but when our constitutions took the fines and forfeitures from the executives, and gave them to the corporate sovereignties, did they not confer on them, and not on the executives, the power to restore? When they took from our executives the power to receive the fines, did they not necessarily take from them the power to restore them? How could it be intended that our executives should restore what was given to another, and what could never come into their possession? How was it possible that our executives should exercise the power of

restoration without the possession ?   If it was intended they
should have this power, would they not have been intrusted
with the possession ?  else how was it possible for them, when
in their discretion they ordered a restoration, to bring it
about?

Suppose they should order a restoration : that could not
bring the money, if the money was spent.    They might
attempt to enforce it by fine or imprisonment, or death ;
but all these would not bring the money, if the money
was gone.    Suppose the fine is paid to the state, how is
the Court of Pardons to enforce restoration ?   It may not
have the money, or if it has, it may not see fit to obey.
How is the Court of Pardons to enforce it ?   If the Court
of Pardons orders the fine to be restored, what is to be
done with the executive mandate?  will it be carried to
the courts, with an order to issue a writ of restitution
upon the state treasury ?   Would it be a proceeding at all
in harmony with the other parts of the constitution, that
the court should take specific affirmative action at the
mandate of the executive ?   From time immemorial has
such an order ever been issued by the British Crown, or
by the executive of any of these states, to any of the
courts?    As long as the pardoning power confines itself
to preventing the punishment or the collection of the fine,
its action is in the nature of a release of the state's right
to collect or punish.   It prescribes no action to the courts.
When the courts come to collect the fine, they find the
right released by the agent of the party entitled to receive,
and they can proceed no further.   But an order to restore
what has been already paid over, is an entirely different
thing.   It is then affirmative, and not negative action.
Suppose the order is taken to the legislature, would they
obey? and if not, what is to be done?   Will the Court of
Pardons attach them for contempt or send them to the
tower?   If they send it to the treasurer, will he not say,
in the language of the constitution, I can let no money
go hence, except for appropriations made by law ?   What

officers have the Court of Pardons to enforce their order, or will they do it with a file of soldiers? Would not any proceeding of the kind we have indicated be in discord with the whole spirit of our institutions, and a thing unheard of hitherto in any of these states?

Again, if this power of restoration exist in the Court of Pardons, it is impossible for the legislature to so vest a fine or forfeiture, as that it is not subject at any time afterwards to be divested by their order. In the case before us, the legislature have passed a law vesting this fine in the county. They had received it, and probably appropriated it to county purposes, two years before this pardon was granted. The plaintiff contends that the pardon divests the county of the right to the fine. No law can be passed which would ever definitely vest a fine anywhere, if this power exists in the Court of Pardons. Can we believe that the constitution intended to lodge such anomalous powers in the state executives? This would be giving our state executives much larger powers than the crown ever enjoyed, for it could release no other rights but its own. As soon as any interest vested in a subject, or anybody else than the king, his rights over it entirely ceased.

I conclude, therefore, that it never was the intention to vest this power of restitution in our Court of Pardons; that the only object of this grant of power, so far as property was concerned, was to stay the hand of justice while still uplifted, not to cure the effect of its final fall: to stay the infliction of punishment, not to restore life or property after it had been suffered.

But suppose the Court of Pardons have power to restore a fine after payment to the state. The defendants contend that this fine, having been paid to them by the state before the pardon, they have no such power as against them.

Supposing this power to restore to exist in the Court of Pardons, as a part of the general pardoning power conferred on them by the constitution, yet it was a funda-

mental principle, that this power could only release what belonged to itself. After a *qui tam* commenced, it could only release its moiety; after costs awarded, it could not release them; and so with everything else after a right had vested. It could release only its own right. Here the counties pay the costs on most of the indictments, and the legislature pay over to them these fines, to make them some recompense for these disbursements. After the counties have received the money, they have a vested interest in them, which, upon no idea of the pardoning power, the crown could ever have divested or released.

But suppose the Court of Pardons to have the abstract power to restore a fine, it is contended, in the third place that no action of debt lies against the defendants.

The case does not show the declaration, as if the pleader did not very well see how it could be drawn. It cannot be founded upon this pardon and remission as a judgment or decree; for this pardoning power is enumerated expressly amongst the executive powers. The Court of Pardons is in no judicial sense a court. It is not called a court in the constitution. It is first so called in the act approved January 18th, 1853. *Nix. Dig.* 571. But this is evidently a legislative misnomer. Whether we look to its origin, its prototype, or its duties, it is in no sense a court. It has before it no parties, it hears no evidence, it decides no law, and it can render no judgment. No suit can, therefore, be sustained upon this pardon or remission as a judgment or decree of a judicial tribunal.

Will an action lay for money had and received? The judgment of conviction is not reversed. The Court of Pardons has no such judicial power. As the Court of Pardons cannot reverse the judgment of conviction, it can only stop proceedings under it. But suppose it does this, it amounts to nothing, for no proceedings are wanted by the defence. The defendants can say, we hold the fine under the judgment. This action of debt, therefore, if it

can be maintained at all, must be upon this remission as a simple executive mandate.

But there are many reasons why an action of debt will not lie upon this mandate. First, if intended to be binding on the defendants, it should have been addressed to them, and distinctly ordered them to restore the fine. In the second place, this mandate is not such a legal liability as that debt may be maintained upon it. No instance of such an action on such a mandate can be found in our books, nor has such a thing, I apprehend, ever been heard of. No such executive mandate can itself create a debt, nor can its obedience be enforced by such an action in our courts. If the Court of Pardons issues its order on the defendants to restore this fine, the enforcement is in its own hands. They enforce obedience by such means as they may deem necessary; but clearly no action of debt will lie upon it. If enforced at all, it must be *proprio vigore.* If the Court of Pardons may make such a mandate, why not make it directly on the defendants, and order them to pay the money over to the plaintiff, and if they disobey, award the punishment themselves?

That the Court of Pardons, when they remitted this fine, had no idea that they were exercising any such power as is now sought to be given it, is, I think, apparent from the words of the remission itself. They have in it only used the words of the constitution, making no order at all, or upon anybody. If they had intended to make a binding order upon the defendants to restore this fine, would they not have said so, directed the order to the defendants, and plainly and in unequivocal terms, have ordered them at a certain time to pay back this money to the plaintiff?

If the plaintiff had supposed the Court of Pardons had intended to exercise such a power, would he not have served the order upon the defendants, and upon their refusal to obey, applied to the Court of Pardons to enforce their mandate? This can be the only remedy; any other

proceeding must be by treating their action as in its nature judicial.

I am of opinion that the case shows no cause of action in the plaintiff, and that judgment should be entered for the defendants.

OGDEN and RYERSON, Justices, concurred.

AFFIRMED, 3 *Dutch.* 637.